## Meade v. Ward et al.

(Decided Feb. 4, 1938.)

HOWES & WALKER for appellant.

W. J. WARD for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing on original and affirming on cross appeal.

On May 21, 1932, Dr. L. G. Meade began this action against W. J. Ward, Jr., and his wife Lou C. Ward to obtain the sale of a certain house and lot on Bridge street in Paintsville, Ky., which he claimed was mortgaged to him to protect him as the indorser of certain notes executed by W. J. Ward, Jr., to the Paintsville National Bank, which notes Meade alleged he was compelled to pay. Dr. Meade was unsuccessful. Mrs. Lou C. Ward recovered a judgment against Dr. Meade for $350, and the only recovery made by Dr. Meade was a judgment for $1,900 against W. J. Ward, Jr., without security for its payment. Dr. Meade has appealed and W. J. Ward, Jr., has prosecuted a cross-appeal.

For many years Dr. Meade has been indorsing notes for W. J. Ward, Jr., and on the 19th day of May, 1927, Lou C. Ward and her husband, W. J. Ward, Jr., executed a mortgage to Dr. Meade to secure him against loss by reason of his indorsement of the following notes to the Paintsville National Bank; one for $2,750, another for $1,000, another for $500, and still another for $400.

One of these mortgaged lots abutted on Euclid avenue, it was 50x140 feet in extent and is referred to as the Euclid avenue property. The other lot fronted 50 feet on Bridge street and had a depth of 178 feet, and was referred to as the Bridge street property. In November, 1928, this Euclid avenue property was sold for $5,000, and upon the margin of the above-mentioned mortgage this release was made:

"The indebtedness held against first lot, men-

tioned in this mortgage, being the same lot transferred of even date by W. J. Ward and Lou C. Ward to W. R. Meade is fully satisfied and held for naught.

"Attest:

"Walter Van Hoose, Clerk,

"L. G. Meade."

It will be noted that this release is not very clear. All four of the above-described notes were liens on both the Euclid avenue property and the Bridge street property. The mortgage shows that the first lot was this Euclid avenue property, hence we know definitely the property upon which the lien was released, but this mortgage, as stated above, secured four notes and one of them was just as much a lien on each of these properties as was the other, so it is not clear, so far, just what indebtedness was paid. In the evidence it clearly appears that it was the $2,750 note that was then paid, and that what the parties really intended to do was this: That all liens should be released on the Euclid avenue property and that the $2,750 note should be satisfied leaving the $1,000 note, the $500 note, and the $400 note unpaid, with the lien on the Bridge street property to pay them.

We will now note the conduct of Mr. and Mrs. Ward in an effort to discover just what was done at the time this Euclid avenue property was sold. They continued to renew these last three notes at the Paintsville National Bank and to pay the interest upon the renewals with perhaps ever increasing difficulty in paying the interest. At least we find that on December 22, 1931, Dr. Meade had to advance to Mr. Ward $71 to enable him to meet the interest on them. That seems to have been the last time these notes were renewed, for on March 4, 1932, the bank marked the $400 note paid and surrendered it to Dr. Meade, and on April 25, 1932, the $1,000 and the $500 notes were in like manner marked paid and surrendered to Dr. Meade, and in less than 30 days this suit was filed.

On the 20th of September, 1932, Lou C. Ward filed her verified answer in which she offered this defense; that the title to this mortgaged property was in her,

that these three notes of $400, $500, and $1,000 were her husband's debts and not hers, and that she was then a married woman and only signed this mortgage as surety for her husband. A demurrer was properly sustained to that answer.

On October 14, 1932, Lou C. Ward filed an amended answer in which she said:

"That said mortgage was not read to her and that she did not understand the contents thereof and that the plaintiff's agents, servants and employees misled and misinformed her as to the property that was to be mortgaged, and that by mistake and oversight and fraud on the part of the plaintiff's agents, servants and employees she signed said mortgage and that if she had known said mortgage was being executed on the property described in plaintiff's petition she would not have signed said mortgage."

On February 10, 1934, Dr. Meade filed depositions taken on his behalf and on February 17, 1934, Mr. and Mrs. Ward filed depositions taken on their behalf. These depositions for Mrs. Ward were devoted mainly to the issues raised by the amended answer mentioned above; that is, to whether or not the mortgage given to Dr. Meade was intended to cover the property on Bridge street. The only mention Mrs. Ward made of the real issue as hereinafter developed is this:

"Q. Now, the property that you sold to W. R. Meade, what did W..R. Meade give for that property? A. Five Thousand ($5000.00) dollars.

"Q. Did he execute to you a check for that $5000? A. Yes sir.

"Q. What did you do with that check? A. I assigned it over to Dr. Lloyd Meade.

"Q. Did he give you anything in return back? A. No sir, he did not."

At this point we will copy from the deposition of Dr. Meade, all he has to say that throws any light upon the real issue that was subsequently developed.

"Q. If I had owed you anything more than what was included in the mortgage at that time,

you would have put it in the mortgage wouldn't you? A. As I remember it, I sold you a piece of property for $2250.00 along about the time this mortgage was executed and the $2250.00 went on that piece of property and $2750.00 went on as a release to the property sold to Bill Meade, that is just as I remember it.

"Q. Don't you know, Doctor, that this $2750.00 represented the property that you sold me? A. I sold you two pieces of property, that may have represented one of them, as I remember it since you mentioned this that I sold you one piece of property for $2750.00 which is represented by this $2750.00 indebtedness here, then there was another piece of property I sold you for $2250.

"Q. Well, but then this represented all the indebtedness that I owed didn't it? A. That is all that is mentioned in this mortgage, I wouldn't state that. That is all I am secured for in this mortgage."

Out of all this careless pleading and loosely taken depositions, these facts were fairly developed: That Dr. Meade was indorser for W. J. Ward, Jr., on the four notes first above mentioned and was protected by a lien on the Euclid avenue property and the Bridge street property; that the Euclid avenue property was sold to W. R. Meade for $5,000; that the check for this $5,000 was turned over to Dr. L. G. Meade; and that $2,750 of it was regarded, considered, and intended as payment and satisfaction of the $2,750 note.

### The After Thought.

After the above issues had been made up for two years, after all the proof had been taken, after Mr. and Mrs. Ward had paid the interest on the renewals of this $1,000 note, the $500 note, and the $400 note for six years, there was tendered by Mr and Mrs. Ward, on February 26, 1934, what they style "answer and counterclaim."

This document was ordered filed on March 3, 1934. In tnis instrument they make a new issue which is this: They claim now that Dr. L. G. Meade got this $5,000 check; he admits that. They claim that out of it there was first paid the $2,750 note; that seems to be ad-

mitted. It is then claimed in this last "answer and counterclaim" that the $1,000 note, the $500, and the $400 note were paid out of this $5,000, and that there was left in the hands of Dr. L. G. Meade $350 which was due Lou C. Ward, and for that sum she asked judgment against Dr. Meade, and the court gave it to her. Dr. Meade categorically denied everything in this amended answer and counterclaim. Our question on this appeal revolves around the correctness of this action of the court in giving her a judgment for $350 and in dismissing Dr. Meade's petition wherein he sought to enforce a lien on the Bridge street property for the $1,000 note, the $500 note, and the $400 note, and $71 interest he had paid for W. J. Ward, Jr. We have copied above all the evidence there is in the depositions that throws any light on this.

Human nature is a part of every record that comes to this court and in arriving at the truth we must consider the acts and conduct of the parties in the light of our knowledge of human nature and when we look at this judgment and this record, some strange things appear; things the average human being would not have done. For example, if these three notes of $1,000, $500, and $400 were paid out of the $5,000 received by Dr. Meade when the Euclid avenue property was sold, these three notes would never have been renewed after that. When demand was made of Mr. Ward for their renewal he would have said: "These notes were all paid out of the proceeds of the sale of the Euclid Avenue property." Yet, he continued to renew these notes for four years thereafter, and to pay the interest on them at each renewal.

If the present contention, made in this "answer and counterclaim" is correct, Mrs. Ward was entitled to $350 at the time this $5,000 check was turned over to Dr. Meade. Yet, for six years she was content to meekly wait and murmur not before she thought of asking for this $350. We wonder just why it was that she swore to the first two answers that were filed, and did not swear to this last one. We are not impressed by this last answer and counterclaim. The evidence does not support the contentions made in it. The acts and conduct of Mr. and Mrs. Ward have not been the acts and conduct of normal human beings.

The trial court erred in accepting as correct their contention in this matter. Therefore, the judgment is reversed on the original appeal and affirmed on the cross-appeal, with directions to the trial court to enter a judgment for Dr. Meade and award him a lien on the Bridge street property for everything he has lost by reason of his indorsement on these three notes, including this $71 interest, and ordering a sale of the Bridge street property to pay it all.